UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LIBERTY SHIPPING GROUP, LLC
979 Marcus Avenue, Suite 200
Lake Success, NY 11042,

          Plaintiff,

   v.

THE UNITED STATES OF AMERICA
c/o UNITED STATES
DEPARTMENT OF JUSTICE
950  Pennsylvania Avenue, NW
Washington, DC 20530

 UNITED STATES MARITIME
ADMINISTRATION
1200 New Jersey Avenue, SE
Washington, D.C. 10590

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT
1300 Pennsylvania Avenue, NW
Washington, D.C. 20523

UNITED STATES DEPARTMENT
OF AGRICULTURE
1400 Independence Avenue, NW
Washington, DC 20250

         Defendants;
   and

U.S. UNITED OCEAN SERVICES, LLC
601 S. Harbour Island Blvd.,
Tampa, Florida 33602

       [Proposed] Intervenor.

[PROPOSED] VERIFIED COMPLAINT
UPON INTERVENTION

Case No. 1:09-CV-03161-ENV-VVP

Judge Eric N. Vitaliano
Magistrate Judge Viktor V. Pohorelsky

NOW COMES Plaintiff – Intervenor, U.S. United Ocean Services, LLC and alleges upon information and belief as follows:

## JURISDICTION

1.      This action seeks judicial review of certain decisions of the Defendants United States of America, U.S. Maritime Administration ("MARAD"), U.S. Agency for International Development ("USAID") and U.S. Department of Agriculture ("USDA") (collectively, the "United States" or "the Government Defendants").  Jurisdiction is proper pursuant to: 28 U.S.C. § 1331 (Federal Question); 28 U.S.C. § 1333 (Admiralty); and 5 U.S.C. §§ 701 *et seq.* (Administrative Procedure Act).

## PARTIES

2.      Intervenor U.S. United Ocean Services, LLC is a privately owned limited liability company organized under the laws of the State of Florida with its principal place of business in Tampa, Florida.  United was originally established to own and operate "U.S.-flag" vessels in the domestic trades of the United States.  United currently owns or operates a fleet of eleven U.S.-flag vessels, nine of which have participated in the U.S. Government international food aid programs.  United has provided transportation of such international food aid cargoes for the U.S. Government since the early-1980s.

3.      Although Liberty Shipping Group, LLC ("Liberty") and United have common interests in this litigation, their interests are not aligned.  Liberty and United are direct competitors in the U.S. Government food aid programs and have been since the early-1980s.

4.      Defendant USAID is an agency of the U.S. Government and its headquarters is located in Washington, D.C.  Among other duties, USAID has overall administrative authority over certain U.S. international food aid assistance programs such as Title II of the Agriculture

Trade and Development Act of 1954, 7 U.S.C. § 1721 *et seq.*, and arrangements for ocean transportation for certain grant or aid cargoes consistent with the requirements of USDA and the Cargo Preference Act of 1954, as amended (the "Cargo Preference Act" or "the Act"), 46 U.S.C. § 55305.

5.      Defendant USDA is an agency of the U.S. Government and its headquarters is located in Washington, D.C.  Among other duties, USDA has administrative authority to procure and donate the commodities made available for distribution under U.S. international food aid assistance programs.  15 U.S.C. § 714 *et seq.*  The USDA controls the Commodity Credit Corporation ("the CCC"), a Government owned and operated corporation within USDA to whom USDA delegates its authority vis-à-vis the above assistance programs.

6.      Defendant MARAD is an agency of the U.S. Government within the U.S. Department of Transportation.  MARAD's headquarters is located in Washington, D.C.  Among other duties, MARAD is charged with promoting the U.S. merchant marine and has certain authority to provide guidance to other agencies with regard to implementation of the Cargo Preference Act.

## SUBJECT MATTER OF LITIGATION

7.      United owns and operates nine U.S.-flag vessels that regularly participate in the transport of U.S. Government sponsored humanitarian food aid cargoes, including carriage of bagged food aid cargoes (*i.e.*, cargoes with mark or count).

8.      One of the statutory and regulatory mandates applicable to U.S. Government international food assistance is the requirement of the Cargo Preference Act, 46 U.S.C. §55305(b), that at least 75% of the agricultural commodities shipped by the Government be

shipped by U.S.-flag vessels, with a parenthetical noting that the percentage should be *"computed separately for dry bulk carriers, dry cargo liners, and tankers."*

9.      There has been a long history of disagreement between the federal agencies responsible under the Cargo Preference Act for interpreting the Act, specifically what is meant by the statutory parenthetical "computed separately," as quoted above.

- Since 2002, in connection with litigation that raised many of the same issues that are being raised by Liberty and United, the Government has had a specific policy in place with regard to the interpretation of the "computed separately" parenthetical requirement.  (Attached hereto as Exhibit 1).

- This interpretation was formalized in 2002 by MARAD, which formally issued interim guidance on the meaning of the "computed separately" parenthetical under the Act.  (Attached hereto as Exhibit 2).

- Recently the Government abruptly abrogated and reversed the long-standing policy when it entered into a Settlement Agreement with Maersk Line, Limited (filed in the U.S. District Court for the Eastern District of Virginia) on July 10, 2009.  (Attached hereto as Exhibit 8).

- The Government's new policy, contrary to MARAD's 2002 Interim Guidance, requires the exclusion of dry bulk carriers (also known as "bulkers") from bidding for cargoes for dry cargo liners (also known as "liners"), including carriage of bagged food aid cargoes.

- This new policy has caused virtually immediate injury to United by excluding it from bidding for bagged food aid cargoes for tenders issued on July 24, 2009 and awarded on July 30, 2009.

10.     The original 2002 policy was imposed by the U.S. Department of Justice in connection with the Government's litigation position in the several cases then-pending in the U.S. District Court for the District of Columbia, attempting to resolve the various Government defendants' respective – and differing – interpretations of the Cargo Preference Act.  The Attorney General and his delegees have sole authority to conduct and resolve litigation on behalf of the U.S. Government and its agencies.  The Government's interim practice and policy was therefore binding on all the defendant agencies.  28 U.S.C. § 516.

11.     The Government's sudden reversal in July 2009 of a binding practice and policy in effect for seven years without the benefit of advance notice and the opportunity for the public to submit and have considered comments on a proposed rulemaking has caused immediate injury to United and was arbitrary and capricious and in violation of the Administrative Procedure Act. 5 U.S.C. § 706.

## BACKGROUND

**A.      U.S. Government International Food Assistance**

12.     The U.S. Government provides millions of tons of food each year to needy populations all over the world.  In 2008, the U.S. Congress appropriated $2.8 billion for U.S. international food-aid programs, and the United States procured and delivered more than 2.9 million metric tons of food aid.

13.     This generosity is authorized primarily by Title II of the Agricultural Trade Development and Assistance Act of 1954, 7 U.S.C. § 1721 *et seq.,* which is commonly referred to as Public Law 480 or P.L. 480 Title II.  It "establish[es] a program ... to provide agricultural commodities to foreign countries on behalf of the people of the United States," which is to be implemented and administered by USAID, 7 U.S.C. §§ 1721-1722.

14.     Title II authorizes "emergency assistance" and "nonemergency assistance." 7 U.S.C. § 1722.  With respect to emergency assistance, the statute grants USAID the following authority:

> Notwithstanding any other provision of law, the Administrator may provide agricultural commodities to meet emergency food aid needs under this subchapter through governments and public or private agencies, including intergovernmental organizations such as the World Food Program and other multilateral organizations, in such manner and on such terms and conditions as the Administrator determines to respond to the emergency.

7 U.S.C. § 1722(a).

15.     As the quoted authorization indicates, Title II assistance is primarily provided through private voluntary organizations or relief agencies, such as Catholic Relief Services and the United Nations World Food Program headquartered in Rome, Italy (collectively "Cooperating Sponsors").

16.     USDA procures agricultural commodities through the Commodity Credit Corporation ('CCC") to be donated to the Cooperating Sponsors and subsequently delivered as food aid.  The CCC issues rules and guidance to govern the terms and conditions under which it will donate the commodities and pay for associated transportation.  7 C.F.R. Part 1496; see also 72 Fed. Reg. 6450 (Feb. 12, 2007) (discussing promulgation of CCC rules).  Ocean transportation contracts for the food assistance cargoes and subsequent distribution of the commodities is done by the Cooperating Sponsors, subject to USAID's instructions and procedures and the direct supervision or by USAID itself; but the U.S. Government agrees to pay all expenses relating to the international food aid programs.  USAID approves all cargo tenders that are issued soliciting bids and makes all cargo awards.

17.     MARAD has no operational role either in procurement of commodities or contracting for ocean transportation services, but it does provide to USAID and USDA a "fair and reasonable" guideline rate for U.S.-flag vessels carrying the international food aid cargoes. See 46 C.F.R. § 381.4.

**B.     The Cargo Preference Act**

18.     One of the many statutory and regulatory mandates applicable to U.S. Government international food assistance in general and P.L. 480 Title II in particular is the Cargo Preference Act of 1954, 46 U.S.C. § 55305.

19.     As amended, the Act requires that at least 75 percent of U.S. Government sponsored food-aid cargoes be transported in qualified U.S.-flag vessels as long as they are available at fair and reasonable rates. Specifically, the Cargo Preference Act provides that when there is sufficient U.S. Government involvement:

> the appropriate agencies shall take steps necessary and practicable to ensure that at least 50 percent [75 percent for food aid cargoes] of the gross tonnage of the equipment, materials, or commodities (computed separately for dry bulk carriers, dry cargo liners, and tankers) which may be transported on ocean vessels is transported on privately-owned commercial vessels of the United States, to the extent those vessels are available at fair and reasonable rates for commercial vessels of the United States, in a manner that will ensure a fair and reasonable participation of commercial vessels of the United States in those cargoes by geographic areas.

46 U.S.C. § 55305(b) (emphasis added).

20.     In the case of P.L. 480 Title II, the "appropriate agency" which must take "steps necessary and practicable" to achieve compliance with the Cargo Preference Act is USAID.

21.     USAID regulations applicable to the procurement of agricultural commodities and related ocean transportation services under P.L. 480 Title II require that contracts will be entered

into in a manner that will result in the lowest landed cost of such commodity delivery to the intended destination, consistent with applicable law including cargo preference requirements.

22.     The role provided to MARAD in connection with the administration of the Cargo Preference Act is as follows:

> Each department or agency that has responsibility for a program under this section shall administer that program with respect to this section under regulations and guidance issued by the Secretary of Transportation. The Secretary, after consulting with the department or agency or organization or person involved, shall have sole responsibility for determining if a program is subject to the requirements of this section.

46 U.S.C. § 55305(d)(1).

23.     Since there is no dispute that the Cargo Preference Act applies to the P.L. 480 Title II, the second operative sentence giving MARAD "sole responsibility" to determine if a program is subject to cargo preference has no application in the present case.

24.     The present dispute among the parties centers on the parenthetical "(computed separately for dry bulk carriers, dry cargo liners, and tankers)" contained in the Cargo Preference Act.

**C.     MARAD's Interim Guidance Issued In November 2002**

25.     As noted above, there has been a long history of disagreement between the responsible agencies as to the correct interpretation of the disputed parenthetical in the Cargo Preference Act.

26.     In 2002, a U.S.-flag liner carrier, Victory Maritime, Inc., sued USAID in the U.S. District Court for the District of Columbia for failure to meet the 75% level required by the parenthetical with regard to "liners." Two other carriers – Sabine Transportation Company and K-Sea Transportation Corporation – were permitted to intervene as defendants. Additional, litigation, which was eventually consolidated, was initiated by Liberty Shipping Group Limited

Partnership and Gulfcoast Transit Company (the predecessor entity to United). The responsible agencies were unable to agree on a common litigation position and the District Court administratively closed the cases, with the direction that a status report be filed concerning the future course of the matter once the DOJ determined the litigation position of the federal defendants. In submitting its litigation position, the DOJ noted that "[t]he federal agencies that are the principal defendants in the litigation [USAID, USDA & MARAD] have admittedly not interpreted the statutory provisions at issue in a uniform manner" but that DOJ had now "determined that the position of the United States in this litigation is as follows:

> 1.    The Cargo Preference Act, at 46 U.S.C. § 1241(b)(1) [since recodified at 46 U.S.C. § 55305(b)], requires that at least 75% of the agricultural commodities shipped by AID be shipped by U.S. flag vessel [sic] 'computed separately for dry bulk carriers, dry cargo liners, and tankers.' The 75% minimum must be computed separately for each category of vessel.

> 2.    <u>In defining the terms 'dry bulk carrier' and 'dry cargo liner,' the government believes that at the time of the adoption of this provision of the Cargo Preference Act these terms did not refer to the type of vessel but rather to the service of the vessel. 'Dry bulk carrier' refers to irregular service and 'dry cargo liner' refers to regularly scheduled service.</u>

> 3.    AID is mandated to comply with the Cargo Preference Act 'in such a manner as will insure a fair and reasonable participation of United States-flag commercial vessels . . . by geographic areas.' 46 U.S.C. § 1241(b)(1). AID must, of course, comply with 46 C.F.R. §§ 381.4 and 381.5.

Status Report in <u>Victory Maritime Inc. v. Pressley</u>, CA No. 01-381 (D.D.C May 2, 2002) (emphasis added) (Exhibit 1).

27.    Following the DOJ direction, on November 8, 2002, MARAD issued its interim (but still current) guidance interpreting the "computed separately" parenthetical. <u>See</u> "Implementation of Department of Justice Interpretation of Section 901(b) of the Merchant

Marine Act, Pending Promulgation of Rulemaking by the Maritime Administration (MARAD)"

("MARAD's Interim Guidance") (Exhibit 2). The November 2002 Guidance states in part:

> The Civil Division's finding that whether a particular vessel is a 'dry bulk carrier' or a 'dry cargo liner,' is determined by the vessel's service necessitates a determination of what constitutes 'liner service.' <u>A service will be designated as liner service if the service is advertised to the public as ocean freight service of packaged goods by regularly scheduled common carriers, or vessels that follow specific routes to a range of ports on a trade route in U.S. foreign trade.</u> Specific port calls may be added or dropped according to cargo availability or other competitive factors. It is not necessary to the designation of liner service for the carrier to have called any particular port on the trade route with any particular vessel. Nor does it matter to the designation of liner service whether the transportation contract is in the form of booking notes or by voyage or time charter. <u>Service will be designated as 'bulk' service if it comprises an offer, in response to an invitation to bid or other solicitation, to carry bulk cargo (i.e., cargo without mark or count) to any foreign destination</u>. If a service exhibits characteristics of both liner and bulk service, MARAD will determine which category applies.

Exhibit 2 (emphasis added).

28.    The November 2002 Guidance retained the DOJ's May 2002 definitions of "dry cargo liner" and "dry bulk carrier" as referring, respectively, to "regularly scheduled service" and "irregular service," but also expanded upon them, respectively, as follows:

> <u>A service will be designated as liner service</u> if the service is advertised to the public as ocean freight service of packaged goods by regularly scheduled common carriers, or vessels that follow specific routes to a range of ports on a trade route in U.S. foreign trade.

> <u>Service will be designated as 'bulk' service</u> if it comprises an offer, in response to an invitation to bid or other solicitation, to carry bulk cargo (i.e., cargo without mark or count) to any foreign destination.

Exhibit 2 (emphasis added).

29.     The November 2002 Guidance was expressly qualified as interim guidance "pending promulgation of rulemaking."  A December 19, 2002 Department of Justice letter forwarding MARAD's November 2002 Guidance to the federal defendants in  the <u>Victory Maritime</u> litigation (thereby implicitly approving of the Interim Guidance and promising a formal rulemaking in the future) explicitly identified the November 2002 Guidance as "interim policy guidance" that "is in no manner intended to curtail or otherwise influence the direction or outcome of the upcoming rulemaking proceedings, and should not be relied upon for that purpose."  (Attached hereto as Exhibit 3).

30.     MARAD's January 8, 2003 letter distributing the November 2002 Guidance stated that the guidance would be used "until our updated regulations are finalized."  (Attached hereto as Exhibit 4).

31.     To date, the United States has not conducted a formal rulemaking or issued a regulation (beyond the November 2002 Interim Guidance) regarding the meaning of the "computed separately" parenthetical in the Cargo Preference Act.

32.     The <u>Victory Maritime</u> case (as well as the other associated cases) were ultimately dismissed without prejudice on April 11, 2005.  (Attached hereto as Exhibit 5).  United (through its predecessor entity, Gulfcoast Transit Company) has relied on the representations made by the Government since 2002, including the promises made by the DOJ and MARAD that a formal rulemaking would be the process by which the November 2002 Interim Guidance is finalized. <u>See</u> Exhibits 2-4.

**D.     Withdrawn MARAD Guidance in 2009**

33.     Recently, in an effort to overturn the November 2002 Interim Guidance, on May 26, 2009, MARAD unilaterally issued a document entitled "Definition of Vessel Category

Guidance to the Trade," which was almost immediately withdrawn (the "Withdrawn MARAD Guidance") (attached hereto as Exhibit 6).

34.     The Withdrawn MARAD Guidance indicated, with reference to the November 2002 Guidance, that "carriers have been ignoring the part about regular schedules and specific routes and instead have been putting up and taking down website advertising to switch from one vessel category to another in order to obtain cargoes." Exhibit 6.

35.     The Withdrawn MARAD Guidance misstated the November 2002 Guidance, which did not bar a change in the vessel category classification as the services performed by the vessel varied over time.

36.     The Withdrawn MARAD Guidance would have altered the November 2002 Guidance for any cargoes documented after May 27, 2009.  It would have abandoned the vessel "service" criteria definition contained in the November 2002 Guidance and substituted physical vessel characteristics criteria.  The Withdrawn MARAD Guidance would have defined a "dry bulk carrier" as one "designed primarily to carry homogeneous unmarked dry cargoes" and a "dry cargo liner" as one "designed primarily to carry heterogeneous mark and count cargoes in parcel lots."

37.     The Withdrawn MARAD Guidance would have excluded vessels that can serve both as "liners" and as "bulkers," of which both Liberty and United have three.

38.     Soon after issuing the Withdrawn MARAD Guidance, MARAD withdrew it based upon objections it received from other U.S. Government agencies (including USAID and the U.S. Office of Management and Budget).

**E.      MARAD Active Vessel List**

39.      MARAD has a list of U.S.-flag vessels entitled "Active U.S. flag vessels in the Agricultural Preference Trade," which is posted on its web site, in which every vessel is categorized as a "Liner," "Tanker" or "Bulker" (the "MARAD Active Vessel List" or "the List"). The most recent list is dated June 23, 2009 (attached hereto as Exhibit 7).

40.      While the terms "Liner," "Bulker" and "Tanker" are not expressly defined terms in the statute, they were defined by MARAD's binding 2002 Interim Guidance.  Still, MARAD's Active Vessel List misconstrues the definitional requirements by categorizing vessels – not based on based on the services performed by the vessel, as required under the November 2002 Interim Guidance – but based on their physical characteristics.

41.      The MARAD Active Vessel List was authored in secret without any open or public consultation with private industry or affected U.S. Government agencies.

42.      There is no explanation on the MARAD Active Vessel List regarding how it was developed, how the criteria contained in the November 2002 Guidance were applied, or the source of the information utilized.  MARAD has never issued any public notice explaining its actions and soliciting comments about the List.

43.      MARAD has never made an inquiry to United about what type of service United's vessels are providing necessary to categorize properly United's vessels on the MARAD Active Vessel List.

44.      The MARAD Active Vessel List lists nine United vessels, each of which is shown as a "bulker."

**F.      July 10, 2009 Settlement Agreement**

45.      On July 6, 2009, Maersk Line, Limited ("Maersk") sued USAID, USDA and MARAD in the U.S. District Court for the Eastern District of Virginia, alleging, among other

things, that USAID was failing to meet the 75 percent cargo preference for the liner service category because it was utilizing "bulkers" instead of "liner vessels" for certain food aid shipments.  Maersk also alleged that USAID's violations stretched back seven years.

46.     Maersk simultaneously filed a Motion for Preliminary Injunction in which it sought to undo a P.L. 480 Title II procurement that had concluded and was being performed in large measure by Liberty (approximately 82,000 metric tons to be transported by two Liberty vessels in a 153,000 metric ton overall procurement).

47.     On July 10, 2009, Maersk Line voluntarily dismissed its suit without any indication as to how the suit had been settled.

48.     On July 17, 2009, MARAD posted on its web site an agreement, dated July 10, 2009, between the United States and Maersk (Exhibit 8).

49.     The July 10 Settlement Agreement provides that "during the pendency of an interim period in which government officials will determine the legal position of the United States ... USAID and USDA will utilize the vessel classification list of U.S.-flagged vessels in the 'Active U.S. flag vessels in the Agricultural Preference Trade' report ... in order to classify vessels as either a 'dry cargo liner,' 'dry bulk carrier,' or 'tanker.'"  Exhibit 8.

50.     Prior to the July 10 Settlement Agreement, USAID regarded its authority and operation of P.L. 480 Title II program as unconstrained by the MARAD Active Vessel List and fully consistent with the proper application of the November 2002 Guidance.

51.     In the <u>Victory Maritime</u> case, it took the Justice Department almost 15 months from the time the complaint was filed in February 2001 until May 2002 to issue the legal position of the United States.  The Maersk Settlement was reached in less than one week.

52.     The July 10 Settlement Agreement further provides that, as to vessels listed on MARAD's Active Vessel List, the list is frozen – "[c]hanges to the list will be made only to include new vessels which heretofore have not been defined on the basis of type of service." Exhibit 8.

**G.     July 17, 2009 USAID Notice**

53.     On July 17, 2009, USAID posted on its website a "Notice to Ocean Carriers Participating in Title II Food Aid" (the "July 17 USAID Notice") (attached hereto as Exhibit 9). The July 17 USAID Notice refers to the July 10, 2009 Maersk agreement for the first time as governing the USAID ocean procurement process.  The Notice also retroactively applied to July 10, 2009 the requirement that the MARAD Active Vessel List will govern all vessel classifications.

54.     The July 17 USAID Notice was issued without warning and was not subject to public comment.

55.     The July 17 USAID Notice also requires relief agencies, which will be issuing ocean transportation solicitations on July 23 and July 24, 2009, to include a clause that restricts each particular tender for a defined quantity of food aid to a particular category of vessel.

56.     The result of the July 17 USAID Notice is to exclude "bulkers" as so listed in the MARAD Active Vessel List, such as United's vessels, from "liner" tenders even if the vessels are wrongly listed or not listed at all, without giving vessel owners any recourse because the list is effectively frozen by the July 10 Settlement Agreement.

**H.     MARAD's Active Vessel List Improperly Classifies United's Vessels**

57.     Liberty alleges in its complaint (see Liberty Complaint, ¶ 70) that it has at least three vessels currently engaged in "liner service," as defined in the November 2002 Interim

Guidance.  Liberty's website advertises the scheduled routes that its vessels routinely sail.  See http://www.libertymar.com/liner/index.html.  All three of these vessels are listed as "bulkers" on MARAD's Active Vessel List (Exhibit 7).

58.     United's vessels are also engaged in "liner service," principally with regard to vessels sailing from U.S. Gulf port locations to ports in South and East Africa, with return to the United States.  While United operates vessels that run routine liner routes between the U.S. and Africa (just as does Liberty), United does not advertise these routes on its website.

59.     United has three U.S.-flag vessels that follow specific routes to a range of ports on a trade route in U.S. foreign trade and are qualified as "dry cargo liners" under the 2002 Interim Guidance.  These vessels are: (1) the M/V TINA LITRICO; (2) the M/V MARY ANN HUDSON; and (3) the M/V SHEILA MCDEVITT.  To date in 2009, these vessels have discharged food aid cargoes (including bagged cargo) in ports in Africa as follows:

- TINA LITRICO – Djibouti; January 2009

- M/V SHEILA MCDEVITT – Mombasa, Kenya; February 2009

- M/V MARY ANN HUDSON – Beira, Mozambique; March 2009

- M/V MARY ANN HUDSON – Durban, South Africa; June 2009

- M/V MARY ANN HUDSON – Nacala/Mombasa. Mozambique; July 2009

- M/V SHEILA MCDEVITT – Djibouti; July 2009

60.     These vessels are currently engaged in "liner service," as defined in the November 2002 Interim Guidance.

61.     Although the above United vessels each qualify as a "dry cargo liner" under the applicable November 2002 MARAD Guidance, MARAD miscategorizes them in the MARAD Active Vessel List as "bulkers."  See Exhibit 7.

62.     Because United's vessels are miscategorized as "bulkers" by MARAD, United is now barred from submitting offers for bagged food aid cargoes designated as for "liner" cargoes under the July 17 AID Notice (Exhibit 9), even though the United vessels in question are otherwise fully qualified to transport such cargoes.

**I.      USAID Has Already Improperly Rejected United's Offers As Nonresponsive**

63.     For example, in a freight tender issued by USAID on July 24, 2009 (with offers due on July 30, 2009), USAID stated in Paragraph F:

SPECIAL NOTE 'E'-

1.   ON A TEMPORARY BASIS, STARTING ON JULY 10TH, 2009, AND CONTINUING UNTIL SUCH DETERMINATION IS MADE ("TEMPORARY PERIOD"), MARAD, USAID, AND USDA WILL UTILIZE THE VESSEL CLASSIFICATION LIST OF U.S.-FLAGGED VESSELS IN THE "ACTIVE U.S. FLAG VESSELS IN THE AGRICULTURAL PREFERENCE TRADE" REPORT ("REPORT"), WHICH IS PUBLISHED BY MARAD AND MADE PUBLICLY AVAILABLE ON ITS WEB SITE IN ORDER TO CLASSIFY VESSELS AS EITHER A "DRY CARGO LINER," "DRY BULK CARRIER," OR "TANKER". THE REPORT IS AVAILABLE AT THE FOLLOWING WEBSITE:WWW.MARAD.DOT.GOV. CHANGES TO THE REPORT WILL BE MADE ONLY TO INCLUDE NEW VESSELS WHICH HERETOFORE HAVE NOT BEEN DEFINED ON THE BASIS OF TYPE OF SERVICE. USAID'S CARGO PREFERENCE COMPLIANCE CALCULATIONS WILL BE BASED ON THE REPORT DURING THE TEMPORARY PERIOD.

2.   IN ACCORDANCE WITH PARAGRAPH (1) ABOVE, THIS   SOLICITATION   IS   FOR   LINERS   AS CHARACTERIZED BY THE REPORT. AN OFFER WILL BE CONSIDERED NON-RESPONSIVE AND WILL NOT BE EVALUATED IF THE VESSEL(S) PROPOSED ARE NOT LISTED AS LINERS ON THE REPORT.

See Email, FREIGHT TENDER: MCI/TITLE II/INV 089/UGANDA" ("Invitation 089") (all caps in original; emphasis in original) (attached hereto as Exhibit 10).

64.     On July 30, 2009, United received the following message from the USAID contractor managing invitation 089:

> Per CRS Inv. 089 tender Special note "E"(U.S. Flag vessel type), Mary Ann Hudson [sic] is a Bulker type vessel.  Therefore, Bids 1, 2, 4, 5, 6, 7 submitted on behalf of U.S. United Ocean Services are considered non-responsive.

(Attached hereto as Exhibit 11).

## J.     MARAD's Active Vessel List Treats United's Liner Vessels Inconsistent With Other Vessels in Legally Indistinguishable Circumstances

65.     Many vessels on the MARAD Active Vessel List are categorized as "liners" and yet follow routes and schedules similar to those followed by the United vessels.  MARAD therefore is engaging in differential treatment for vessels that are in legally indistinguishable circumstances.

66.     United is unfairly prejudiced by MARAD's failure to treat similarly situated services alike.  The United vessels are prohibited from submitting offers for cargoes designated as "liner" cargoes in P.L. 480 Title II freight tenders issued on July 24, 2009 (as well as subsequent tenders) because they have been miscategorized, while vessels whose characteristics are legally indistinguishable from those of the United vessels will be, and in fact have already been, able to submit offers.

67.     Because United's vessels are listed by MARAD as U.S.-flag "bulkers," they are automatically disqualified from tenders that are reserved for "liners," yet foreign-flag "bulkers" that are not listed on the MARAD Active Vessel List as such may compete for Title II food aid opportunities without the automatic disqualification that United has already faced.  This disparate treatment inserts a degree of anti-American bias in the Cargo Preference Act, which is (ironically) designed to promote U.S.-flag shipping companies.

**K.** **MARAD's Decision To Utilize The July 10 Settlement Agreement To Freeze The Vessel List Was Arbitrary**

68.     The July 10 Settlement Agreement freezes the MARAD Active Vessel List by vessel type. Under the terms of the agreement, no changes are permitted except the addition of new vessels.

69.     Because the MARAD Active Vessel List is frozen, the errors cannot be corrected. This is patently unfair because the July 17 USAID Notice effectively excludes qualified vessels from competition based on the Active Vessel List while allowing offers from other vessels that are miscategorized by MARAD as "liners," even though they fail to meet the standards outlined in MARAD's November 2002 Guidance.

70.     The November 2002 Guidance indicates that vessels will be categorized as between "dry cargo liners" and "dry bulk carriers" based on *service*. The service of vessels inevitably changes over time. Many vessels are suited to undertake irregular service, which MARAD considers a "bulker," or regular service, which MARAD considers a "liner."

71.     Because the MARAD Active Vessel List is frozen for listed vessels, service changes of listed vessels cannot be taken into account, which is contrary to the November 2002 Guidance. The exclusion of vessels from competition based on the MARAD Active Vessel List by the July 17, 2009 USAID Notice also is contrary to the November 2002 Guidance.

72.     MARAD never solicited information from United regarding how to categorize United's vessels nor consulted with United about the proper categorizations for United's vessels under the November 2002 Guidance.

73.     Because the MARAD Active Vessel List is frozen pursuant to the July 10 Settlement Agreement and the July 17 USAID Notice, the erroneous categorizations and listing

of United's vessels are frozen for purposes of AID ocean transportation solicitations that occurred on July  24, 2009 and thereafter.

74.     By entering into the July 10 Settlement Agreement and thereby prohibiting correction of miscategorizations appearing on the MARAD Active Vessel List, and by acting contrary to the November 2002 Guidance, the United States has acted arbitrarily, capriciously and contrary to law.

**L.     USAID's July 17 Notice is Fundamentally Flawed Because It Requires The Bidder Vessels Qualified As Dry Cargo Liners But Listed As Bulkers To Be Found Nonresponsive**

75.     The purpose of the "computed separately" parenthetical in the Act is to ensure fair participation by vessel category for available food aid cargoes.

76.     MARAD takes the position that the 75 percent requirement must be applied on a solicitation-by-solicitation basis so that 75 percent of the cargoes shipped per solicitation must be carried by U.S.-flag vessels, computed separately for dry cargo liners, dry bulk carriers and tankers if they are available at fair and reasonable rates.

77.     However, the July 17 USAID Notice arbitrarily and unlawfully requires relief agencies to allot solicitations to one of the three vessel categories in advance of receiving ocean transportation offers from vessels.  The legal mechanism by which this requirement is effected is to declare the bids of vessels that do not fit the arbitrary advance classification to be declared "nonresponsive."

78.     It is unlawful to allocate solicitations to one or the other of the three vessel categories in advance of receiving offers by all categories of vessels before knowing which vessels will be available (both foreign-flag and U.S.-flag) as well as which types of vessels will be offered and at what rates.

-20-

79.     It is likewise impossible to determine properly in advance how to allocate cargoes to ensure fair and reasonable participation by vessel category before receiving offers of all categories of vessels which will be available (both foreign-flag and U.S.-flag), as well as which types of vessels will be offered and at what rates.

80.     Allocating cargoes to one vessel category or another in advance of receiving offers unlawfully prefers one vessel category and prejudices another. For example, the reservation of all bagged food aid cargoes to "dry cargo liners" prejudices "dry bulk carriers" which otherwise should have a fair and lawful opportunity to participate in a share of the cargoes that can be carried by "dry bulk carriers." Provided a U.S.-flag bulker can offer a better price for shipping the food aid, the Government should be able to take advantage of such an opportunity.

81.     The November 2002 Guidance categorizes vessels by their *service,* not the cargoes they carry or the physical characteristics of the vessel. A vessel can transport bagged commodities and still be a "dry bulk carrier" if it is in irregular service. Similarly, a vessel that is in regular service can transport all bulk commodities without affecting its classification as a "dry cargo liner" under the November 2002 Guidance. Therefore, the requirement in the July 17 USAID Notice that certain cargoes be reserved to certain vessels in advance is contrary to the Cargo Preference Act "computed separately" parenthetical and is arbitrary and capricious.

82.     Restricting vessel offers solely on account of cargo type is also inconsistent with and contrary to applicable USAID regulations which require that commodities and ocean transportation be procured on a "lowest landed cost" basis because offers will be arbitrarily excluded for reasons contrary to the Cargo Preference Act.

83.     The July 17 USAID Notice is also contrary to law because it relies on the frozen MARAD Active Vessel List and the July 10 Settlement Agreement which are arbitrary,

capricious and otherwise contrary to law with respect to the United vessels that qualify as "dry cargo liners."

### COUNT I – Violation of the APA By Misclassifying United's Vessels

84.    Plaintiff repeats and realleges the foregoing allegations in this Verified Complaint with the same force and effect as if hereinafter set forth at length.

85.    The MARAD Active Vessel List is a final agency action.

86.    The MARAD Active Vessel List is arbitrary, capricious and otherwise contrary to law and therefore in violation of the Administrative Procedure Act because it erroneously lists the United vessels that qualify as "dry cargo liners," contrary to the November 2002 Guidance and the Cargo Preference Act.

87.    MARAD's action is arbitrary, capricious and otherwise contrary to law and causes immediate irreparable harm and injury to United by denying United the opportunity to make offers to transport P.L. 480 Title II cargoes it is otherwise qualified to carry.

### COUNT II – Violation of the APA By Treating United's Vessels Differently

88.    Plaintiff repeats and realleges the foregoing allegations in this Verified Complaint with the same force and effect as if hereinafter set forth at length.

89.    The MARAD Active Vessel List is final agency action.

90.    The MARAD Active Vessel List is arbitrary, capricious and otherwise contrary to law and therefore in violation of the Administrative Procedure Act because it treats the United vessels that qualify as "dry cargo liners" under the 2002 Interim Guidance differently than similarly situated vessels in legally indistinguishable circumstances.

91.     MARAD's action is arbitrary, capricious and otherwise contrary to law and causes immediate irreparable harm and injury to United by denying United the opportunity to make offers to transport P.L. 480 Title II cargoes it otherwise is qualified to carry.

## COUNT III – Violation of the APA By Freezing the Active Vessel List

92.     Plaintiff repeats and realleges the foregoing allegations in this Verified Complaint with the same force and effect as if hereinafter set forth at length.

93.     The July 10 Settlement Agreement is final agency action of MARAD, USAID and USDA.

94.     The July 10 Settlement Agreement is arbitrary, capricious and otherwise contrary to law and therefore in violation of the Administrative Procedure Act because it freezes in place the MARAD Active Vessel List without regard to errors, mistaken classifications or new information.

95.     The arbitrary and capricious and otherwise unlawful actions of MARAD, USAID and USDA in agreeing to, and in implementing the July 10 Settlement Agreement cause United immediate irreparable harm and injury by denying United the opportunity to submit information to correct the MARAD Active Vessel List with respect to the United vessels that qualify as "dry cargo liners" under the 2002 Interim Guidance.

## COUNT IV – Violation of the APA By Declaring Qualified Bidders As Nonresponsive Thereby Unlawfully Restricting Solicitations for Food Aid Cargoes

96.     Plaintiff repeats and realleges the foregoing allegations in this Verified Complaint with the same force and effect as if hereinafter set forth at length.

97.     The July 17 USAID Notice is final agency action.

98.     The July 17 USAID Notice is arbitrary, capricious and otherwise contrary to law and therefore in violation of the Administrative Procedure Act because it relies on the unlawful MARAD Active Vessel List and the unlawful July 10 Settlement Agreement.

99.     The July 17 USAID Notice is also arbitrary, capricious and otherwise contrary to law and therefore in violation of the Administrative Procedure Act because it restricts competition by cargo type in violation of the Cargo Preference Act and applicable USAID regulations.

100.    The arbitrary, capricious and otherwise unlawful USAID action in issuing the July 17 USAID Notice causes United immediate irreparable harm and injury by denying United the opportunity to submit bids on ocean transportation tenders being issued on July 23 and July 24 in the P.L. 480 Title II program, as well as in subsequent solicitations.

### COUNT V – Violation of the APA By Entering Into The July 10 Settlement Agreement Requiring Qualified Bidders Be Declared Nonresponsive

101.    Plaintiff repeats and realleges the foregoing allegations in this Verified Complaint with the same force and effect as if hereinafter set forth at length.

102.    United, through its predecessor entity, Gulfcoast Transit Company, was a party to the original 2001 litigation that resulted in the November 2002 Interim Guidance.  At all times, United relied on the promises made by the Government (including the DOJ and MARAD) regarding the fact that the November 2002 policy would be modified only through a formal rulemaking.  See Exhibits 2-4.

103.    The July 10 Settlement Agreement reverses the November 2002 Interim Guidance on which United has long relied.

104.    The July 10 Settlement Agreement is final agency action of MARAD, USAID and USDA.

105.    The July 10 Settlement Agreement is arbitrary, capricious and otherwise contrary to law and therefore in violation of the Administrative Procedure Act because it reversed longstanding administrative practice and policy without the benefit of public notice and comment, as required under the APA.

106.    The arbitrary and capricious and otherwise unlawful actions of MARAD, USAID and USDA in agreeing to, and in implementing, the July 10 Settlement Agreement cause United immediate irreparable harm and injury by prohibiting corrections to the MARAD Active Vessel List with respect to the United vessels qualifying as "dry cargo liners" and by adopting a new policy that unlawfully excludes United's vessels from bidding for bagged food aid cargoes.

**WHEREFORE,** Plaintiff prays that this Court:

1.    Enjoin the United States from administering the Cargo Preference Act contrary to the manner in which it was administered prior to the July 10 Settlement Agreement;

2.    Enjoin the United States from restricting ocean freight tenders under P.L. 480 Title II to particular vessel types;

3.    Hold unlawful and set aside MARAD's decisions and actions wrongly categorizing the United vessels that qualify as "dry cargo liners" under the 2002 Interim Guidance as "bulkers" or "dry bulk carriers;"

4.    Hold unlawful and set aside the July 10 Settlement Agreement as arbitrarily and capriciously restricting competition contrary to law;

5.    Hold unlawful and set aside the July 17 USAID Notice as arbitrarily and capriciously restricting competition contrary to law;

-25-

6.     Hold unlawful the adoption of the July 10 Settlement Agreement without the benefit of public notice and comment;

7.     Order MARAD to revise the MARAD Active Vessel List in accordance with the November 2002 Guidance implementing the Cargo Preference Act;

8.     Order MARAD to treat similarly situated vessels similarly when listing them on the MARAD Active Vessel List or any similar list or document implementing the Cargo Preference Act;

9.     Order MARAD, USAID and USDA not to enforce or implement the July 10 Settlement Agreement;

10.    Order USAID not to enforce the July 17 USAID Notice with respect to United;

11.    Order the United States to withdraw the July 10 Settlement Agreement pending public notice and comment through a formal rulemaking;

12.    Award costs and attorney's fees to Intervenor; and

13.    Award such other relief as the Court deems appropriate.

## VERIFICATION

I, Neil G. McManus, am the Vice President of U.S. United Ocean Services, LLC.

The facts alleged in the foregoing Verified Complaint are true and correct to the best of my knowledge and information based upon my personal knowledge and my review of the records of U.S. United Ocean Services ,LLC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 4, 2009.

_____
Neil G. McManus

Respectfully submitted,

SHEPPARD MULLIN RICHTER & HAMPTON, LLP

By:     /s/     Daniel L. Brown
Daniel L. Brown (DB-0906)
30 Rockefeller Plaza, Suite 2400
New York, NY 10112
(212) 332-3800
Fax: (212) 332-3888
dbrown@sheppardmullin.com

*OF COUNSEL:*
Greggory B. Mendenhall
30 Rockefeller Plaza, Suite 2400
New York, NY 10112
(212) 332-3800
Fax: (212) 332-3888
gmendenhall@sheppardmullin.com

W. Bruce Shirk
David S. Gallacher
1300 I Street, NW, Suite 1100 East
Washington, DC  20005
(202) 218-0000
Fax: (202) 218-0020
bshirk@sheppardmullin.com
dgallacher@sheppardmullin.com

*Attorneys for U.S. United Ocean Services, LLC*

Dated: August 4, 2009